J-A10005-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| WILLIAM LYNN | : | No. 1105 EDA 2020 |

Appeal from the Order Entered March 10, 2020
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0003530-2011

BEFORE:   PANELLA, P.J., McCAFFERY, J., and COLINS, J.*

MEMORANDUM BY PANELLA, P.J.:                **FILED AUGUST 9, 2021**

Monsignor William J. Lynn was convicted in 2012 of endangering the welfare of children ("EWOC") while serving as an official for the Archdiocese of Philadelphia ("Archdiocese"). Specifically, he was convicted of sheltering a priest he knew had a history of grooming and sexually abusing children, thereby enabling the priest to prey on more children. This Court subsequently awarded Lynn a new trial after concluding that the trial court permitted the Commonwealth to present an unfairly prejudicial amount of evidence about Lynn's and the Archdiocese's response to allegations of child abuse against other priests.

---

* Retired Senior Judge assigned to the Superior Court.

For the second time since that retrial was ordered, the Commonwealth has filed an interlocutory appeal from a pretrial evidentiary ruling by the trial court. Here, the trial court has declared that the Commonwealth may not present certain evidence of Lynn's prior testimony, including testimony about a list Lynn made classifying 35 Archdiocese priests accused of pedophilia. The Commonwealth has certified that this ruling will substantially handicap its prosecution of the case. Both the trial court and Lynn question the propriety of the Commonwealth's certification and consequently, whether this appeal is properly before this Court.

We agree with the Commonwealth that this appeal is properly before us, as we have no authority to review the Commonwealth's good-faith certification that an evidentiary ruling will substantially handicap its prosecution of a case. We disagree with the Commonwealth, however, that the evidentiary ruling underlying this appeal constituted an abuse of discretion on the part of the trial court. Accordingly, we affirm.

This matter has a long history and both our Supreme Court and this Court have previously provided a detailed factual summary of this case. *See* *Commonwealth v. Lynn*, 114 A.3d 796, 798-808 (Pa. 2015) ("*Lynn II*"); *Commonwealth v. Lynn*, 83 A.3d 434, 437-445 (Pa. Super. 2013) ("*Lynn I*"), *rev'd* *Lynn II*. We see no need to repeat those details here, but rather, offer a background more tailored to the appeal now before us.

Cardinal Anthony Bevilaqua of the Archdiocese appointed Lynn to serve as the Archdiocese's Secretary for Clergy ("Secretary") in 1992, where he served until 2004. As Secretary, Lynn was responsible for the intake and investigation of allegations of child sexual abuse by priests within the Archdiocese. He was, in his words, the sole "funnel" of information concerning instances of clergy sexual abuse and it was his office that was responsible for passing that information to his superiors in the Archdiocese. Lynn was also responsible for recommending assignments for, and supervising, priests previously accused of such abuse. Cardinal Bevilaqua, however, had the final say in the placement of a priest.

In his capacity as Secretary, Lynn was one of the few Archdiocesan officials with access to the "Secret Archives," which were files that included prior reports of misconduct, including child sexual abuse, by priests. From those Secret Archives, Lynn formulated a list in February of 1994 that divided 35 priests who had been accused of sexual abuse into three groups ("the List"). The three groups consisted of three priests who were labeled a "diagnosed pedophile," 12 who were "guilty of sexual misconduct with minors," and 20 who were the subject of "allegations of sexual misconduct with minors with no conclusive evidence." Exhibit D to Commonwealth's Submission of Synopsis of Evidence Pertaining to List of Sexually Abusive Priests Admitted During Previous Trial, 3/27/20; *see also Lynn II*, 114 A.3d at 800. Lynn attached the List to a memo he wrote to the Assistant Vicar for

Administration, Monsignor James Malloy, on February 18, 1994 which had a subject line reading "Materials in Secret Archives" (hereinafter referred to as the "Dux Memo" given the Memo's specific reference to sexual abuse allegations against Father James Dux). The first paragraph of the Dux Memo read:

> Father Beisel [Lynn's assistant] and I reviewed the 323 files that are presently stored in the Secret Archives. Attached is a list of priests who have been guilty of or accused of sexual misconduct with a minor according to the file material. We were very literal in our reading of the files in order to be as accurate as possible with this list.

Dux Memo, dated February 18, 1994, at 1.

The first name Lynn placed on the List under the group of 12 priests he considered to be guilty of sexual misconduct of minors was Reverend Edward V. Avery. In 1992, R.F. had reported to the Archdiocese that Avery had sexually abused him years earlier when he was a juvenile parishioner and an altar boy at Avery's parish. Lynn investigated those allegations, after which he recommended that Avery be sent to an Archdiocese-affiliated mental health treatment facility for an evaluation. Avery was subsequently admitted to that facility for long-term treatment.

At the facility, Avery was diagnosed with an alcohol problem, but not a sexual disorder. The stated reasons for this were because there had only been one known report of sexual abuse and Avery had been drinking when that abuse occurred. *See* Commonwealth Exhibit 46, Letter from Villa St. John Vianney Hospital, dated 9/28/93, at 1. Nonetheless, upon Avery's release in

October of 1993, the facility recommended that Avery's assignment be one where he would not have direct access to children. **See id**. (recommending that Avery be assigned "a ministry excluding adolescents and with a population other than vulnerable [minors]").

Despite this recommendation and his knowledge of Avery's past, Lynn recommended that Avery be assigned to a parish with a grade school. When that recommendation was rejected for unknown reasons by Cardinal Bevilacqua, Lynn recommended that Avery live in the rectory at St. Jerome's Church in Philadelphia, which also had a grade school attached. That recommendation was accepted and Avery began living in the rectory at St. Jerome's in December of 1993. One of the students at the grade school and an altar boy at St. Jerome's, D.G., later alleged that Avery sexually assaulted him in 1999 when he was ten years old. Avery was not removed from active ministry until December of 2003.

Between 2002 and 2004, Lynn appeared multiple times before a Grand Jury that had been empaneled to investigate claims of sexual abuse by priests and concealment of those claims by the Archdiocese. Lynn's testimony before the Grand Jury included his statements that he had reviewed the files in the Secret Archives, made the List, and attached the List to the Dux Memo. When being questioned about the Dux Memo, which had been produced for the Grand Jury, Lynn asserted that he had been unable to locate the List that had

been attached to the Dux Memo. The List was discovered years later in a safe in Lynn's former office and eventually handed over to the Commonwealth.

Lynn was arrested in 2011, at which time he was charged with two counts of EWOC and two counts of conspiracy to commit EWOC. The charges arose from allegations that Lynn negligently supervised Avery and another priest who had also been accused of sexual abuse, Reverend James Brennan.

Lynn proceeded to a jury trial in March of 2012. At trial, the Commonwealth presented detailed other-acts evidence related to abuse allegations lodged against 21 priests in the Archdiocese other than Avery and Brennan. This other-acts evidence consumed 25 of the 32 days the Commonwealth dedicated to its case-in-chief. On June 22, 2012, after two months of testimony, the jury convicted Lynn of one count of EWOC, related to Lynn's supervision of Avery.[1] The trial court subsequently sentenced Lynn to a term of imprisonment of three to six years.

Following a series of appeals, this Court vacated Lynn's judgment of sentence and granted him a new trial on the basis that the trial court had abused its discretion by admitting a "high volume of unfairly prejudicial other-

_____

[1] Lynn was originally set to be tried alongside both Avery and Brennan. Prior to trial, however, Avery pled guilty to involuntary deviate sexual intercourse and conspiracy to commit EWOC. The trial proceeded against Lynn and Brennan as co-defendants, although the jury failed to reach a verdict on any of the charges pending against Brennan.

acts evidence." ***Commonwealth v. Lynn,*** No. 2171 EDA 2012, 2015 WL 9320082 at *1 (unpublished memorandum) ("***Lynn III***"). Specifically, we concluded that a new trial was warranted because the probative value of the evidence involving the 21 other priests "*in toto*," much of which occurred before Lynn was appointed as Secretary and included the "handling of sexually abusive priests in cases not directly related to the offenses for which [Lynn] was tried for," did not outweigh its high potential for unfair prejudice. ***Id***. at * 15, 20.

Prior to Lynn's new trial, the Commonwealth filed a motion *in limine* seeking to admit evidence related to the abuse accusations leveled against nine of the 21 priests introduced at Lynn's first trial. The Commonwealth argued that this evidence was necessary to demonstrate the supervisory scheme Lynn created to conceal evidence of sexually abusive priests and that Lynn knowingly violated a duty of care to the children at St. Jerome's, including D.G., by allowing Avery to live there. ***See*** 18 Pa.C.S.A. § 4304(a) (requiring the Commonwealth to prove that a defendant knowingly endangered the welfare of children in order to convict him of EWOC).[2]

---

[2] For purposes of Lynn's case, the Commonwealth is operating under the EWOC statute effective from 1995 through 2004. That version stated that "a parent, guardian or other person supervising the welfare of a child under 18 years of age commits a misdemeanor of the second degree if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a) (amended 2006, 2017). In ***Lynn II***, our
*(Footnote Continued Next Page)*

Following a hearing, the trial court ruled that the Commonwealth could present other-acts evidence related to three of the priests that Lynn had directly supervised; namely, Father Robert Brennan, Father Nicholas Cudemo and Father Michael Bolesta, all of whom Lynn had also placed on the List.[3] The court ruled, however, that the Commonwealth could not present evidence of allegations related to the other six priests. According to the trial court, allowing evidence regarding the three named priests would be sufficient to allow for the Commonwealth to "show knowledge, and refute an isolated mistake on the part of Lynn." *Commonwealth v. Lynn*, 192 A.3d 165, 172 (Pa. Super. 2018), *appeal denied*, 212 A.3d 502 (Pa. 2019) ("*Lynn IV*") (citation to trial court opinion omitted).

The Commonwealth appealed. This Court affirmed the trial court's order, concluding that the trial court had not abused its discretion by limiting the

_____

Supreme Court held that Lynn, as Secretary, owed the children a duty to protect them from sexually abusive priests. *See Lynn II*, 114 A.3d at 819.

[3] Cudemo was listed as a diagnosed pedophile, and Brennan and Bolesta were listed under the no conclusive evidence category of the List. Our Supreme Court summarized the allegations against Bolesta, *see Lynn II*, 114 A.3d at 809-811, and Cudemo, *see id*. at 811-812. Detective James Dougherty testified about the allegations against Robert Brennan, and Lynn's involvement with those allegations, at length at Lynn's first trial, including on May 10, 2012. *See* N.T. Trial, 5/10/12, at 118-199. Moreover, a summary of the allegations against Robert Brennan can be found in the Commonwealth's Exhibit 1251, Jack Rossier's Executive Summary of Allegations Against Reverend Robert Brennan, undated, at 286-312.

other-acts evidence to the three priests. ***See id.*** at 173 (stating that the trial court had not abused its discretion by excluding six of the nine instances of other-acts evidence based on its determination that the six excluded instances were highly prejudicial but only marginally probative). Our Supreme Court denied the Commonwealth's petition for allowance of appeal. ***See id.***, 212 A.3d 502 (Pa. 2019).

Upon the case's return to the trial court, the court scheduled trial for March 16, 2020. On February 12, 2020, the Commonwealth filed another motion *in limine*, this time seeking to admit certain testimony Lynn gave (1) on May 23, 2012, May 24, 2012 and May 29, 2012 of his first trial, (2) at civil depositions on June 19, 2014, September 22, 2014 and September 28, 2016, and (3) at his original sentencing. According to the Commonwealth, this testimony pertained to "conduct relative to [Lynn's] duties regarding and involvement with sexually abusive priests, generally, and Avery, Bolesta, Brennan, and Cudema, specifically." Commonwealth's Motion *in Limine* to Admit Evidence of Defendant's Trial, Sentencing and Deposition Testimony ("Commonwealth's 2/12/20 Motion *in Limine*"), 2/12/20, at 3. The Commonwealth attached an exhibit which specifically listed the testimony it sought to admit by category, date, page and line number. ***See*** Exhibit A to 2/12/20 Motion *in Limine*, 2/12/20, at 1-5.

Lynn filed a reply to the Commonwealth's 2/12/20 Motion *in Limine*, urging the court to deny the motion on multiple grounds. Those grounds

- 9 -

included the fact that the verdict in Lynn's first trial had been vacated due to the erroneous admission of the other-acts evidence of the 21 other priests and because the evidence the Commonwealth sought to admit, according to Lynn, was unfairly prejudicial.

Lynn also filed several of his own motions *in limine*, including one seeking to preclude the Commonwealth from presenting any evidence concerning Lynn's 2002 and 2004 testimony before the Grand Jury. He attached a letter from the Commonwealth as an exhibit to his motion *in limine*, which listed the portions of testimony the Commonwealth intended to admit from Lynn's Grand Jury testimony on June 7, 2002, June 13, 2002, and February 27, 2004. ***See*** Exhibit A, Letter from Assistant District Attorney Patrick Blessington dated 2/12/2020, to Defendant Lynn's Motion *in Limine* to Preclude the Commonwealth from Presenting Evidence Concerning His Grand Jury Testimony from 2002 and 2004, 2/25/20 ("Lynn's 2/25/20 Motion i*n Limine*").[4]

---

[4] Although the reproduced record and supplemental reproduced record compiled by the Commonwealth is over 1600 pages in length, the reproduced record did not contain a copy of either Lynn's 2/25/20 Motion *in Limine* or the Exhibit A attached to that motion. We were able to locate Lynn's 2/25/20 Motion *in Limine* in the certified record, but Exhibit A was not attached. Upon informal inquiry from our Prothonotary, we were able to obtain a copy of Exhibit A and it is now included in the record.

Following a hearing, the trial court entered an order on March 10, 2020, ruling on the motions *in limine* regarding the admissibility of Lynn's prior testimony. Specifically, the court ruled that the Commonwealth was allowed to introduce certain portions of the requested testimony from Lynn's first trial and the depositions as outlined in the Commonwealth's Exhibit A to the Commonwealth's 2/12/20 Motion *in Limine*, but was precluded from admitting other portions of that testimony. The order specifically identified those portions of the trial and deposition testimony that the court deemed inadmissible. The court also ruled that the Commonwealth was allowed to introduce Lynn's testimony from the Grand Jury as requested, with the exception of specifically-identified testimony from the Grand Jury proceedings on February 27, 2004.[5] Lastly, the court ruled that the Commonwealth was precluded from introducing any evidence of Lynn's testimony from his original sentencing.

_____

[5] Even more specifically, the court ruled that the following requested portions of prior testimony were inadmissible: eight of the requested portions of testimony from the trial on May 23, 2012; 19 requested portions of testimony from the trial on May 24, 2012; eight requested portions of testimony from the May 29, 2012, trial; one requested portion from the deposition testimony from June 19, 2014; and seven portions of the testimony from the Grand Jury proceedings on February 27, 2004. The order listed the excluded portions of testimony by category, date, page and line number. **See** Trial Court Order, 3/10/20, at 1-3.

At a hearing the following day, the Commonwealth sought reconsideration of the court's order and asked the court for its reasoning behind its exclusion of the evidence. The court responded:

> The basis for [exclusion of evidence] is that it was either irrelevant or it was the prejudicial value outweighed the probative value or it was in some way related to the other crimes of evidence that had been excluded and did not really relate to the three [instances of other-acts evidence] that were permitted. And the court went through every line, every page of the requested testimony and sought to only allow that which related to the case as it is now, the three matters of [other-acts evidence] that have been allowed, and [the court] sought to strike that balance.

N.T. Hearing, 3/11/20, at 36.

The Commonwealth countered, in effect, that the court's order would substantially handicap its ability to prosecute the case because it erroneously precluded testimony regarding Lynn's general decision-making process, Lynn's creation of the List, and the fact that Lynn had told the Grand Jury that he could not locate the List even though the List was later discovered in Lynn's former office. The court directed the Commonwealth to submit a written proffer of the relevance of the evidence it believed the court had erroneously precluded. The Commonwealth complied, filing a proffer of relevant evidence on March 12, 2020.

On March 16, 2020, the day Lynn's retrial was scheduled to begin, the parties appeared before the court but the case was not able to proceed as the court had received notice that the courts were to be closed in light of the COVID pandemic. The parties continued to argue about the admissibility of

Lynn's prior testimony, as well as the admissibility of documentary evidence at Lynn's retrial, which the court rescheduled for January 4, 2021. The court noted that it was holding the Commonwealth's request to reconsider the March 10, 2020 order under advisement.[6]

_____

[6] Upon another informal request from our Prothonotary, an order dated and filed on March 11, 2020 denying the Commonwealth's motion to reconsider the court's redactions to Lynn's prior testimony was placed in the record. However, the Commonwealth represented at the exchange on March 16, 2020, that it had filed a motion to reconsider the court's March 10, 2020 order the previous Thursday (March 12, 2020), though the docket does not reflect such a motion. Either way, the court stated on March 16 that it was in the process of reviewing the Commonwealth's motion to reconsider the March 10, 2020 order and would therefore hold it under advisement. Both parties agree that the trial court did not issue a ruling on the Commonwealth's motion following that statement on March 16.

Further, in light of the parties' continued arguments pertaining to the admissibility of evidence regarding the List on March 16, 2020, the court also asked the Commonwealth to submit yet another synopsis of evidence pertaining to the List, this time including documents, that it intended to admit at retrial. On March 27, 2020, the Commonwealth filed a "Submission of Synopsis of Evidence Pertaining to List of Sexually Abusive Priests Admitted During Previous Trial." In its reproduced record, the Commonwealth included an April 30, 2020 response from Lynn to its March 27, 2020 submission, but that response was not docketed nor made part of the certified record. Again, upon yet another informal request by our Prothonotary, Lynn's response, "Defendant William Lynn's Reply to Commonwealth's Proffer of Evidence and its Submission of Synopsis of Evidence Pertaining to List of Sexually Abusive Priests Admitted During Previous Trial and in Further Support of Defendant's Motion *in Limine* to Limit the Evidence Outside the Scope of the EWOC Charge," was made part of the record. In the response, Lynn moved for the trial court to exclude the documents, including the Dux Memo and the List, the Commonwealth stated in its March 27, 2020 submission that it planned to introduce at Lynn's retrial. We note that the only ruling before this Court in this appeal relates to evidence of Lynn's prior testimony, and not to any other evidence.

The Commonwealth filed a notice of appeal from the March 10, 2020 order on May 4, 2020, which was deemed timely pursuant to the April 28, 2020 Emergency Order of the Supreme Court responding to the COVID pandemic.[7] In its notice of appeal, the Commonwealth certified that the court's order precluding the admission of certain trial and Grand Jury testimony would substantially handicap its ability to prosecute the case pursuant to Pa.R.A.P. 311(d), which provides that in criminal cases:

> [T]he Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

Pa.R.A.P. 311(d).

The trial court ordered the Commonwealth to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The Commonwealth did so, arguing that the trial court had improperly precluded evidence of Lynn's trial and Grand Jury testimony relating to Lynn's: (1) supervision of Avery; (2) creation and concealment of the List of sexually abusive priests; (3) role in the creation of the Archdiocese's written sexual abuse policy; (4) knowledge of grooming techniques used by sexual abusers; and (5) transfer of sexually abusive priests to new parishes. In light of the large quantity of evidence at issue, the court directed the Commonwealth to file a supplemental 1925(b)

---

[7] The April 28, 2020 Emergency Order provided that any papers due to be filed between March 19, 2020 and May 8, 2020 were to be deemed timely if filed by May 11, 2020.

statement which specifically identified the dates, pages and line numbers of the testimony the Commonwealth believed the court's March 10, 2020 order improperly prohibited. The Commonwealth complied, listing 24 specific instances of alleged error by date, page and line number. *See* Trial Court Opinion, 8/21/20, at 4-5.

Following the Commonwealth's submission of its supplemental statement, the trial court issued a 1925(a) opinion. In its opinion, the court first questioned whether the Commonwealth had properly certified the interlocutory appeal or "whether the Commonwealth [was instead] abusing its right to file an Interlocutory Appeal, and [was] taking undue advantage of the COVID-19 crisis to further delay prosecution of this case." *Id*. at 6-7. The court posited that because the Commonwealth had not immediately filed an appeal from the March 10, 2020 order and the court "remained open to reviewing, once again, the redacted portions of Lynn's prior testimony," the Commonwealth's interlocutory appeal "should be denied." *Id*. at 7.

Nonetheless, the court found that even if the appeal had been properly brought, the Commonwealth's claim that the court had erroneously precluded portions of Lynn's trial and Grand Jury testimony was without merit. To that end, the court concluded that both the Grand Jury and trial testimony admitted by the trial court did, in fact, address Lynn's supervision of Avery, his role in creating the Archdiocese sexual abuse policy, his knowledge of grooming techniques as well as the transfer of sexually abusive priests to other parishes.

*See id*. at 10, 14. The court also found that it had properly excluded the testimony the Commonwealth sought to admit regarding the List as it was too "difficult to separate the testimony about the act of creating the List and Lynn's inability to find it from the evidence about impermissible testimony about priests other than Avery, Brennan, Bolesta and Cudemo, the number of cases involved, and acts of the Archdiocese not attributable to Lynn." *Id*. at 19.

On appeal, the Commonwealth initially takes issue with the trial court's indication that this interlocutory appeal is not properly before our Court because the trial court suspected the Commonwealth's certification had not been made in good faith. The Commonwealth argues that this Court has definitively and repeatedly made clear that the Commonwealth's certification that an unfavorable pretrial evidentiary ruling will substantially handicap its ability to prosecute the case is not subject to review. We agree with the Commonwealth and find that its appeal is properly before us.

At the outset, we note that this issue implicates this Court's jurisdiction as this Court can only entertain appeals from appealable orders. *See Commonwealth v. Jones*, 826 A.2d 900, 903 (Pa. Super. 2003). Appealable orders include interlocutory orders as of right pursuant to Pa.R.A.P. 311(d), which, as noted above, entitle the Commonwealth to take an appeal from an interlocutory order if it certifies in good faith that the order will substantially handicap its case. *See* Pa.R.A.P. 311(d); *Commonwealth v. Boczkowski*, 846 A.2d 75, 87 (Pa. 2004) (stating that when the Commonwealth makes a

good-faith certification that a pretrial order excluding Commonwealth evidence substantially handicaps its case, the Commonwealth is entitled to an interlocutory appeal as of right under Rule 311(d)).

Here, the Commonwealth certified in its notice of appeal that the court's order excluding certain evidence related to Lynn's trial and Grand Jury testimony would substantially handicap the prosecution of its case. This Court has stated that when the Commonwealth makes such a certification that a pretrial order excluding Commonwealth evidence will substantially handicap its case, it has "an absolute right to appeal" and "is not required to demonstrate the need for [the excluded] evidence." ***Commonwealth v. King***, 689 A.2d 918, 921 (Pa. Super. 1997). This is because "when a pretrial motion removes evidence from the Commonwealth's case, only the prosecutor can judge whether that evidence substantially handicaps his ability to prove every essential element of his case." ***Commonwealth v. Cosnek***, 836 A.2d 871, 875 (Pa. 2003) (citation omitted). As such, courts are not permitted to inquire into the Commonwealth's good-faith contention that the exclusion of evidence substantially handicaps the prosecution. ***See Commonwealth v. Rich***, 167 A.3d 157, 161 (Pa. Super. 2017); ***Commonwealth v. Moser,*** 999 A.2d 602, 605 (Pa. Super. 2010) (stating that if a trial court ruling excludes Commonwealth evidence and the Commonwealth has certified that the effect of the ruling is to substantially handicap its case, the appeal is properly before the Court).

Based on this case law, it is clear that the Commonwealth is correct that this Court may not review the Commonwealth's good-faith certification that the pretrial order excluding evidence the Commonwealth sought to admit substantially handicaps its case. In fact, Lynn all but concedes that our case law prohibits us from questioning the reasons behind the Commonwealth's certification that an order excluding evidence substantially handicaps its prosecution. *See* Appellee's Brief at 9.

Lynn maintains, however, that the question of the Commonwealth's good faith in bringing the appeal is a "different matter entirely." *Id*. He suggests that this Court has the ability to scrutinize the Commonwealth's intentions in making the certification itself; or, in other words, to evaluate whether the Commonwealth actually made the certification in good faith. He points to **King** in support of this contention, but **King** simply does not establish the broad proposition advocated by Lynn. Instead, **King** merely cites the general principle that the "Commonwealth's good faith certification, alone, provides an absolute right to appeal" before stating that the Commonwealth in that case had provided the proper certification that a pretrial evidentiary ruling substantially handicapped its case. **King**, 689 A.2d at 921. As the Commonwealth observes:

> The **King** Court itself found that once the Commonwealth makes a good faith certification, its right to appeal is absolute. Neither **King** nor any other case creates or authorizes an examination of the Commonwealth's good faith. The idea is illogical. It would require an appellate court simultaneously to accept the Commonwealth's good faith assertion that it has a critical need for

- 18 -

precluded evidence, yet require it to examine whether the appeal is asserted in good faith.

Commonwealth's Reply Brief at 8-9 (citation omitted).

This Court has, in fact, previously rejected the claim raised by Lynn. In **Commonwealth v Belani**, 101 A.3d 1156 (Pa. Super. 2014), Belani argued that the Commonwealth's interlocutory appeal of an adverse evidentiary ruling was improper because its certification of the appeal under Rule 311(d) had not been made in good faith. Like Lynn does here, Belani asserted that this Court had the ability to evaluate whether the Commonwealth had acted in good faith so as to determine whether it was entitled to an appeal as of right pursuant to Pa.R.A.P. 311(d). This Court rejected Belani's argument, stating that:

> We decline … Appellee Belani's suggestion that this Court inquire into the Commonwealth's good-faith certification; we are not permitted to conduct such an inquiry. [**See**] **Moser**, 999 A.2d at 605 n.2 (collecting cases).

**Belani,** 101 A.3d at 1157 n.1.

As stated above, we agree that we are not allowed to conduct this inquiry and we therefore conclude that the Commonwealth's appeal is properly before us. With the question of jurisdiction behind us, we are now able to consider the merits of the Commonwealth's claim on appeal that the trial court erred by excluding certain portions of Lynn's prior testimony at his retrial.

Before we do so, we briefly address Lynn's "preliminary" argument that the trial court erred by not finding that *all* of Lynn's prior trial testimony was

inadmissible because it was unconstitutionally compelled. **See** Appellee's Brief at 20-23. It is this claim, not the Commonwealth's, that is not properly before us at this time. As the Commonwealth observes, this is a cross-claim seeking affirmative relief and Lynn did not file a cross-appeal. **See Richards v. Ameriprise Financial, Inc.** 217 A.3d 854, 865 n. 7 (Pa. Super. 2019) (stating that an appellee is required to file a cross-appeal where the trial court did not grant the appellee the relief they sought).

Moreover, even if Lynn had filed a cross-appeal, our case law is clear that a defendant stands in different shoes than the Commonwealth when faced with an adverse pretrial evidentiary ruling, as the defendant retains the opportunity to object at trial and seek appellate review if convicted. **See Commonwealth v. Ivy**, 146 A.3d 241, 256 (Pa. Super. 2016). "Under such circumstances, the element of finality, which is the basis of appealability, is lacking in an order denying suppression and the defendant should have no right of appeal from such [an] order." **Id**. (citation omitted). Unlike Lynn, the Commonwealth would have no such appellate recourse if we did not review its claim regarding the court's adverse pretrial evidentiary ruling, which we turn to now.

The Commonwealth argues that the trial court's order excluding certain portions of Lynn's previous trial and Grand Jury testimony amounted to an abuse of discretion because the excluded evidence was highly probative of Lynn's mental state. Specifically, the Commonwealth contends that the

evidence excluded by the trial court is necessary to establish that Lynn knowingly endangered the welfare of D.G. and other children at St. Jerome's when he returned Avery to active ministry and failed to seek his removal. The Commonwealth asserts that the excluded evidence is not, contrary to what the trial court found, unduly prejudicial or barred by previous decisions by this Court. Based largely on the analysis of the trial court, which we have attached for ease of reference, along with our own review of the record, we conclude that the Commonwealth is not entitled to relief.

At its core, this case involves a challenge to the trial court's ruling on the admissibility of certain evidence identified in the motions *in limine*. What makes this case unusual is the sheer volume of the evidence in question. Still, when reviewing such a challenge, we apply an evidentiary abuse of discretion standard of review. ***See Belani***, 101 A.3d at 1160 (stating that when an appellate court reviews the denial or grant of a motion *in limine*, the court must apply an evidentiary abuse of discretion standard). This standard of review recognizes that a trial court has broad discretion to determine the admissibility of evidence. As such, we will only disturb the trial court's determination in this regard if it reflects an abuse of that discretion; that is, if the determination reflects manifest unreasonableness, partiality, prejudice, bias or ill-will, or such a lack of support so as to be clearly erroneous. ***See id***.

Generally, the threshold question with the admission of evidence is whether the evidence is relevant. ***See Commonwealth v. DiStefano***, 236

A.3d 93, 98 (Pa. Super. 2020). Pursuant to our Rules of Evidence, evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and that fact is of consequence in determining the action. *See id*.; Pa.R.E. 401. Even if evidence is relevant, however, the court can still exclude the evidence if it concludes that the probative value of the evidence is outweighed by, among other things, a danger of unfair prejudice, confusing the issues or needlessly presenting cumulative evidence. *See* Pa.R.E. 403.

When evidence involves "a crime, wrong, or other act," it is inadmissible to prove a person's character in order to show that the person acted in accordance with that character. Pa.R.E. 404(b)(1). Such evidence may be admissible, however, when relevant for another purpose such as proving motive, knowledge or absence of mistake. *See* Pa.R.E. 404(b)(2). It is only admissible for such a purpose in criminal cases, though, when the trial court determines that the probative value of the evidence outweighs its potential for unfair prejudice. *See id*. In this context, unfair prejudice means a "tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 *cmt*.

In addressing the Commonwealth's claim on appeal that the trial court had improperly excluded evidence of Lynn's prior testimony, the court noted that the Commonwealth had identified five general areas in which it believed

the court had improperly excluded evidence. Those five areas consisted of Lynn's prior testimony related to: (1) his supervision of Avery; (2) the List, including its creation, contents, use, and concealment; (3) his role in the creation of the Archdiocese's written policy on sexual abuse; (4) his knowledge of grooming techniques used by abusers; and (5) the transfer of priests accused of sexual abuse to other parishes. The trial court made clear that when it initially considered the pool of Lynn's prior testimony that the Commonwealth sought to present at Lynn's retrial, it had exhaustively gone through every line of that testimony from Lynn's trial and his appearances before the Grand Jury to determine whether or not it should be allowed at the retrial.

As for the Grand Jury testimony that the trial court ruled admissible from that pool, the court noted that it had allowed the requested Grand Jury testimony from June 7, 2002, and June 13, 2002, in its entirety, as well as specific portions of the requested testimony from February 27, 2004. The trial court summarized the permissible testimony as follows:

> The permissible testimony from June 7, 2002 included evidence which can be summarized as follows: Lynn's current, as of 6/7/02, tenure with the [Archdiocese as Secretary] whose duties included investigating allegations of sexual abuse involving priests; current, as of 6/7/02, Archdiocese policy which Lynn helped to codify in writing in 1993 regarding Archdiocese investigation of sexual abuse complaints; step by step details about how Lynn handled the investigation of a sexual abuse allegation; what occurred when a priest admitted the abuse, including treatment referrals and discussion about laicization (defrocking); what was told to the complainants about investigations; details about the location of [the Secret Archives,

which was in the Office of the Vicar of Administration, in the same office building as Lynn's office], and who had access to the Secret Archives where documents pertaining to sexual assault allegations were maintained; who in the Archdiocese hierarchy were informed about complaints [the Office of the Vicar of Administration and the Cardinal] and who was involved in the discussion about what would be disclosed to a parish or school about the investigation. All of this prior Lynn testimony was ordered admissible.

The Commonwealth's requested Lynn Grand Jury testimony from June 13, 2002 was ordered admissible in its entirety. In summary[,] that testimony focuses on: the location of and placing in order by Lynn sexual abuse files [from his office and the Secret Archives] for Archdiocese attorneys in preparation for discussions with the Philadelphia District Attorney; further discussion about the Archdiocese policy [on sexual abuse] codified in 1993, specifically regarding reporting sexual abuse allegations to the police; Lynn's knowledge of Pennsylvania law which in 1995 made clergy mandatory reporters where minors were involved and how that requirement was conveyed to members of the Archdiocese [and Lynn's recollection that he had never reported any allegations to police]; any training regarding the mandatory reporting requirements; Lynn's role in training new priests about the mandatory requirement and his role in investigating claims of sexual abuse. There was also significant testimony about Archdiocese policy for repeat offenders. On this issue [,] Lynn testified 'Since I've been here, I'm not aware of anybody that has repeated - we hadn't put them back in ministry except for those limited groups' … [Lynn also admitted that there were priests] 'who had offended, had undergone treatment and were not found to be pedophiles, but had engaged in an act of pedophilia.'

Lynn's February 27, 2004 Grand Jury testimony focused on the same themes probed in 2002, but with more specificity; much of which was ordered admissible for the pending retrial. The permissible evidence elicited from that testimony included: there was no formal training for, and none was offered by the Archdiocese save for a few workshops to prepare Lynn for his duties to investigate priest sexual abuse matters; Lynn characterized his training as 'on the job' initiated when [prior to being appointed Secretary] he assisted Monsignor Malloy as a note-taker interviewing those involved in sexual abuse complaints; when Lynn became aware of the Secret Archives, and how he did not go through those files until two years into his role

as [Secretary], and did so 'to see - to make sure I knew or had an idea - make sure we didn't have anybody in ministry that shouldn't be in ministry'; as part of the sexual abuse complaint process Lynn checked the Secret Archives to see if the priest in question had a file there; Lynn's duties as [Secretary] also included the assignment of priests, a process which included discussion with a limited group in the Church hierarchy at priest personnel meetings where great deference was given to Lynn's recommendations; in making priest assignment recommendations[,] Lynn presumed a priest did not have allegations of sex abuse in their past because otherwise they would not be in ministry, and described the minimal criteria for making that presumption; Secret Archive files of priests up for reassignment were rarely discussed at personnel board meetings because 'they all had a right to their reputation', and, references to the sex abuse review of Fathers Cudemo and Brennan. Interspersed throughout, Lynn was questioned about how the Archdiocese handled/[as well as the Archdiocese's] policy before and after Lynn's assignment as [Secretary].

Trial Court Opinion, 8/21/20, at 8-10 (footnotes omitted).

The trial court then proceeded to list, by date, page and line number, the Commonwealth's requested testimony from Lynn that it had ruled admissible from Lynn's trial on May 23, 2012, May 24, 2012 and May 29, 2012. *See id*. at 10-14. Next to each section of testimony deemed to be admissible at the retrial, the court offered a summarized list of the content of that particular section of testimony. *See id.* While that list can be referred to for a complete compilation of the large amount of testimony allowed, we offer the following summary of Lynn's trial testimony the court deemed admissible at Lynn's retrial.

May 23, 2012 Admitted Trial Testimony

The testimony deemed admissible from Lynn's trial on May 23, 2012, included Lynn discussing his investigation, supervision and reassignment of Avery. In general terms, Lynn testified that he could only independently remove a priest accused of sexual abuse from ministry if the priest admitted to the abuse allegations, and because Avery had denied the allegations, Lynn recommended an evaluation at a mental health treatment center. *See* N.T. Trial, 5/23/12, 83(3-24); 194(2-14); 202(24) - 203(8). Lynn also testified that although the treatment center did not diagnose Avery with a sexual disorder, the center nonetheless recommended an assignment where Avery would not have direct contact with children. *See id.* at 88(12-23). Lynn explained that the Cardinal required him to recommend a reassignment for a priest, such as Avery, after the completion of treatment unless the priest had received a diagnosis of pedophilia or ephebophilia.[8] *See id*. at 92(6-17); 197(5-13). Lynn essentially testified that he was doing his best with the recommendations for reassignments given the parameters that he was working within and that when "a bishop told you to do something, you did it." *Id*. at 198(6-7).

Lynn agreed that it was his responsibility as Secretary to receive information regarding sexual abuse allegations and pass that information up

---

[8] In ***Commonwealth v. Williams***, this Court noted that the PCRA court in that case had defined ephebophilia as the "sexual attraction of adults to adolescents." 168 A.3d 97, 99 n.2 (Pa. Super. 2017).

the chain of command of the Archdiocese as well as to provide information to the treatment center when a referral was made. *See id*. at 199-202(22). He also acknowledged that he had determined that Avery was guilty of sexual misconduct and believed that "someone can be guilty of sexual misconduct but not have a sexual disorder." *Id*. at 206(4-7). He admitted that he had seen cases where someone is not diagnosed as a pedophile but still sexually abuses children. *See id*. at 218(21) - 219(3).

May 24, 2012 Admitted Trial Testimony

As for Lynn's testimony from trial the following day, May 24, 2012, the first section of his testimony that the trial court ruled admissible dealt with Lynn's supervision of Cudemo, one of the priests whose other acts had previously been deemed admissible at retrial by *Lynn IV*. Lynn acknowledged that Cudemo is a pedophile and that he had designated him as such on the List. *See* N.T. Trial, 5/24/12, at 71(18-19); 81(3-4). When asked about the statement that he had given to the police when they were investigating allegations against Cudemo, Lynn confirmed that he had told the officer that Cudemo was retired. *See id.* at 67(2-12). Lynn admitted on the stand, however, that retirement meant that Cudemo could still assist in ministry and had done so. *See id*. at 69(22) - 71(8). Lynn also testified that he told the officer that Cudemo had denied allegations of abuse, though the Commonwealth introduced an exhibit showing that Cudemo had, in fact, admitted to perpetrating abuse against young girls. *See id*. at 77(4) - 78(14).

Lynn further admitted that he "forgot" to tell the officer about eight of Cudemo's other sexual abuse victims and that he told the officer he had been assured that Cudemo, despite being a pedophile, was not a danger to anyone. *See id*. at 72(23-25); 80(19) - 81(8).

The testimony the court ruled admissible from May 24 also included Lynn's reiteration that he was only allowed to take actions against priests if they had received a diagnosis of pedophelia or ephebophilia. *See id*. at 136(10-12). He recounted that he had been told by the "professionals" that many of the priests who had "acted out with a minor" were merely considered to be sexually immature. *Id*. at 136(13) - 137(3). He clarified that "acting out with a minor" could include groping, oral sex and anal sex. *Id*. at 136(23-25).

The trial court also allowed Lynn's testimony on May 24 regarding allegations made against, and the subsequent transfer of, Bolesta, whose other-acts evidence had also been ruled admissible by *Lynn IV*. *See id*. 149(15) - 153(6); 154(14) - 155(6); 155(18) - 157(7). That testimony included the fact that the eighth-grade boys at Bolesta's former parish were angry because Bolesta was known to have engaged in misconduct with boys at their parish, but was reassigned to a new parish without any warning to the children there. *See id.* at 152(10) - 153(6). The admitted testimony also included Lynn conceding that he did not make announcements to the media or the parish of a priest who had been reassigned to it because of previous sexual abuse allegations. *See id*. at 161(14) - 162(3).

May 29, 2012 Admitted Trial Testimony

Part of the testimony deemed admissible from May 29, 2012, involved Lynn being questioned in greater detail about R.F.'s allegations of sexual abuse against Avery. That testimony included Lynn's awareness that R.F had alleged that Avery engaged in wrestling with altar boys and that Avery touched his crotch while wrestling with him. *See* N.T. Trial, 5/29/12, at 98(5-16). It also included Lynn's denial that Avery's disc jockeying activities were associated with the sexual abuse of R.F., even though R.F. reported that Avery had sexually abused him after he had helped Avery with his disc jockeying and gotten drunk at a bar in Philadelphia. *See id.* at 96(19) - 97(24). Lynn also admitted that he had lied to a parishioner about his reasons for Avery's removal from the parish. *See id.* at 101(4)- 102(22).

The trial court also found that the Commonwealth could introduce Lynn's testimony that although the treatment center was concerned that Avery had victims other than R.F. and that Avery's diagnosis had partially been based on the existence of only one known victim, Lynn had never tried to locate any of those other potential victims. *See id*. at 103(6-16); 105(25) - 106(7). It also allowed Lynn's testimony that despite the treatment center's recommendation that Avery be assigned a ministry excluding adolescents, Lynn nonetheless first recommended that Avery be assigned as an associate pastor to a parish with a grade school. *See id*. at 107(9-21). Then, when that recommendation was rejected for unknown reasons, Lynn admitted that he recommended that

Avery live at St. Jerome's rectory, which also had a grade school attached. *See id*. at 109(9-22). Lynn conceded that Avery remained at St. Jerome's, even though shortly after the assignment, Lynn had prepared the List and added Avery's name under priests "guilty of sexual misconduct [with minors]." *See id*. at 121(6-15).

The trial court also ruled that the Commonwealth could present Lynn's testimony regarding Avery's disc jockeying activities. Lynn testified at one point that Avery's disc jockeying was a "one-time thing" but then admitted that there had been many additional complaints over the years that Avery continued to disc jockey at events, including a dance at St. Jerome's, even though he had repeatedly been instructed to stop. *See id.* at 122(19) - 126(10); 126(17) - 127(4); *see also id.* at 133(15-25) (prosecutor referring to an exhibit and stating "You told [Avery] no more D.J. parties. This is eight years after you first told him no more D.J. parties, right?" and Lynn responding to that question that this time he used a "strong" tone).

Lynn further admitted to keeping Avery in the ministry despite his observation in a memo from 1998 that Avery continued to minimize the abuse allegations that had been made against him. *See id*. at 132(6-12). Lynn claimed, again, that he did not have the authority to take Avery out of the ministry. *See id*. He acknowledged that he only took further action against Avery years later when an Archdiocese review board was established. He agreed that this action was too late to protect D.G. from Avery's abuse and

he was sorry for that. *See id*. at 131(17-24); *see also id*. at 134(7-11) (Lynn being questioned as to whether he had kept Avery "near children because he was at St. Jerome's Parish where he had access to altar boys, one of whom he sexually assaulted, [D.G.], correct?" and Lynn responding with the confirmation that "[Avery] was still at that parish, yes").

The trial court also found that Lynn's testimony from May 29, 2012, that dealt with the sexual allegations against Robert Brennan, Cudemo and Bolesta could be admitted at the retrial. Lynn agreed that he was the "eyes and the ears of the Cardinal" in matters of sexual abuse of minors by priests. *See id*. at 52(15-21). Regarding Brennan, Lynn testified that he relied upon the advice of the professionals that Brennan's rubbing the upper thigh of an altar boy was merely a "boundary violation" rather than sexual misconduct. *See id*. at 53(13) - 54(4). He further testified that he told the pastor at Brennan's assignment following release from in-patient treatment that Brennan was not allowed to touch anybody, even though there was a memo documenting that Lynn had not done so. *See id*. at 55(6-23); 58(11-17).

Regarding Bolesta, Lynn testified that he placed him under the inconclusive category on the List despite complaints of sexual abuse from multiple victims, which included the grabbing of one boy's testicles, because Bolesta's therapist considered such conduct to amount only to "boundary violations." *See id*. at 87(17) - 88(16). Lastly, regarding Cudemo, Lynn testified that it was the Cardinal, and not him, that had removed restrictions

from Cudemo in 1996. *See id*. at 76(9-11). When asked whether he saw "any moral problem with letting [Cudemo] out there acting fully as a priest when he had been diagnosed as a pedophile?" Lynn responded that he did but that he was merely "working with the limited authority I had." *See id*. at 76 (12-17, 23-24).

Based on its review of all of this evidence it ruled admissible at Lynn's retrial, the court came to the following conclusion:

> A review of the admissible prior testimony, as set forth above, should make it apparent that Appellant Commonwealth's claim of error in its 1925(b) Statement, paragraph (1), (3), (4) and (5) are simply false and unsupported accusations. A gleaning of that testimony establishes that this Court allowed all, and which is a significant amount, prior Lynn testimony concerning: his supervision of Avery; his role in the creation of [the] Archdiocese sexual abuse policy; his knowledge of grooming techniques used by sexually abusive priests; and his role in the assignment of priests [ ] and any assignment/movement of priests with sexual abuse allegations as it relates to Avery, Brennan, Bolesta and Cudemo.

Trial Court Opinion at 14.

Our own review of each of the lines of testimony that the trial court ruled admissible leads us to the conclusion that the trial court did not abuse its discretion in finding that it had, contrary to the Commonwealth's assertions, allowed for the introduction of evidence related to four of the five areas of evidence that the Commonwealth identified in its 1925(b) statement. The record clearly supports the trial court's determination that the large quantity of Lynn's prior testimony allowed by the court addresses Lynn's supervision of Avery, Lynn's role in the creation of the Archdiocese's sexual abuse policy,

Lynn's knowledge of grooming techniques used by abusers, such as wrestling and disc jockeying, and the transfer of priests accused of sexual misconduct to different parishes.

On appeal, the Commonwealth does not focus on these four areas as much as it does on its argument that the court erred in excluding evidence pertaining to the remaining area of evidence it identified in its 1925(b) statement: the evidence centering on the List. Specifically, the Commonwealth now complains that the trial court abused its discretion by excluding evidence of Lynn's testimony regarding his review of the Secret Archives, the composition of the List following that review, the attachment of the List to the Dux Memo and his claim to the Grand Jury that he was unable to find the List.

In its Pa.R.A.P. 1925(a) opinion, the trial court listed Lynn's trial testimony, along with an excerpt of the content of the testimony, that the Commonwealth argues was improperly redacted by the court. *See* Trial Court Opinion, 8/21/20, 16-19. The Commonwealth offers its own general summary of the redacted testimony as follows:

> The evidence the lower court precluded shows that at the beginning of 1994, [Lynn] conducted an extensive review [of] the Archdiocese's Secret Archives files for reports of clerical sexual abuse of minors, which familiarized him with the scope and nature of abuse; and classified 35 priests in active ministry based on his level of certainty of their guilt. The precluded evidence further shows that [Lynn] wrote [the Dux] memo accompanying that List indicating that he wanted to prevent the dissemination of knowledge of the abuse; and that [Lynn] gave inconsistent

testimony about where the List was kept. … and his access to, and possession of, the List.

Commonwealth's Brief at 36, 49.

Just as with the evidence deemed admissible, a more detailed understanding of the evidence deemed inadmissible is necessary to evaluate the trial court's March 10, 2020 order as a whole. Accordingly, we add our own synopsis highlighting the testimony pertaining to the List that the Commonwealth identified in its supplemental 1925(b) statement as being improperly excluded.

• • • • • • • • • • •

<u>May 23, 2012 Excluded Trial Testimony</u>

The trial court precluded the Commonwealth from presenting Lynn's testimony that he had produced a large number of files for priests on the List, priests other than Avery, for the Grand Jury. *See* N.T. Trial, 5/23/12, at 168(19) - 170(10). In fact, he had produced files for "every name that is on the list of 35." *See id*. at 169(23) -170(10). Those files included the Dux file, which contained the Dux Memo. *See id*. at 166(14) - 167(16). He testified that the Dux Memo referenced the List, which would have been attached to the Memo. *See id*. at 167(17-23). Lynn stated that he had told the Grand Jury that he was unable to find the List. *See id*. at 170(19-23). He agreed that there were sick individuals on the List, which he "believed" he had been the one to type up, but denied that the disappearance of the List was helpful to his defense. *See id*. at 219(21) - 222(18).

The trial court also redacted Lynn's testimony that he never put the concerns of priests accused of sexual abuse over concerns for the victims. ***See id.*** at 181(9-13). It further precluded Lynn's testimony that despite this concern, and despite his statement to the Grand Jury that he usually informed the victim that they could report their allegations to the police, he could not name any case where he had informed the victim in this manner. ***See id***. at 223(20) - 226(20).

May 24, 2012 Excluded Trial Testimony

The trial court also redacted Lynn's testimony that he had taken the Dux File to a meeting with the Cardinal regarding the Dux Memo, and left the entire file at that meeting. ***See*** N.T. Trial, 5/24/12, at 38 - 43(14). He testified that he had forgotten this had occurred when he told the Grand Jury that he had looked for the List but could not find it. ***See id***. at 47(19) - 48(3). He admitted that the List was later found in a safe in his former office, though it was "not his safe," and that an electronic copy of the List had also been found on a computer disc in his former office. ***See id***. at 49 (2-6); 50(13-25). The court also disallowed Lynn's testimony that he had looked on his computer for the List but could not find it before appearing before the Grand Jury. ***See id***. at 121(14) -126(7).

The trial court also redacted testimony regarding what actions Lynn took or failed to take against the priests on the List. ***See id***. at 51(12) - 55(8). It also excluded evidence of questions regarding which priests on the List were

pedophiles, which were guilty and which, "like Cannon," were inconclusive. *See id*. at 120(25) - 121(13).

May 29, 2012 Excluded Trial Testimony

As for Lynn's trial testimony on May 29, the trial court redacted testimony that Lynn could only make recommendations about the reassignments for priests on the List, and that he knew that it was not worth making certain recommendations because the Cardinal would only remove a priest if he had been diagnosed with pedophelia or ephebophilia. *See* N.T. Trial 5/29/12, at 84(5-14). He denied being "perfectly content" with leaving pedophiles and guilty priests in active ministry, and he was "doing what he could do." *Id*. at 84(17-24).

The trial court also precluded Lynn's testimony that he was required to make recommendations for reassignments for all priests unless they received a diagnosis for pedophelia or ephebophilia, that he didn't like doing it, that the assignment recommendation would generally depend on what information he had about a particular priest and that matters concerning the sexual abuse of minors were considered confidential. *See id*. at 128(4) -129(11). The trial court also precluded an excerpt of testimony asking Lynn if he had seen a "pattern" of priests wrestling with altar boys, to which he responded "not with every one of them." *Id*. at 98(17-23).

February 27, 2004 Excluded Grand Jury Testimony

The trial court did not summarize the testimony from Lynn's testimony before the Grand Jury on February 27, 2004, that the Commonwealth claims was improperly redacted, other than to say it was similar to the precluded trial testimony. While that is true, we add the following details regarding the excluded Grand Jury testimony. The redacted testimony involved Lynn's statement that the allegations against Dux had prompted him to go through the Secret Archives to see if there were other priests in active ministry who had been accused of abuse. *See* N.T. Grand Jury, 2/27/04, at 48(25) - 50(22); 52(22) - 53(3). The trial court also redacted Lynn's testimony regarding the contents of the Dux Memo, including the allegations against Dux and the fact that Lynn had compiled the List of sexually abusive priests from the Secret Archives, and that the List had been attached to the Dux Memo. *See id*. at 54(20) - 56(19); 58(23) - 59(25); 61(18) - 63(10). It also redacted Lynn's testimony that he was unable to find the List at the time. *See id*. at 60(2-3).

The court also redacted testimony regarding who in particular was on the List under each category and what, if any, action Lynn had taken against them. *See id*. at 57(17)-58(5); 63(12-15); 64(6) - 65(7); 96(6-17). It also excluded evidence of Lynn being asked about the statement on the Memo that "only basic information is contained in this report so as not to have too much in writing on this matter." *Id*. at 67(7) - 67(15). It also redacted testimony regarding what Lynn looked for in each of the 323 files in the Secret Archives, including those files that contained allegations that predated his tenure as

Secretary and his testimony that he ignored files that contained anonymous and hearsay allegations. ***See id***. at 72(4)-75(24); 77(6) - 79(18); 85(18) - 88(3).

● ● ● ● ● ● ● ● ● ● ●

In considering the admitted and excluded evidence as a whole, we find no abuse of discretion in the trial court's conclusion that some of the testimony it excluded was merely cumulative of testimony it had deemed admissible. Moreover, the Commonwealth concedes that the trial court's order will allow for the jury to hear some evidence of Lynn's testimony about going through the Secret Archives, the List itself, and that Lynn was unable to locate the List when he testified before the Grand Jury.[9] The Commonwealth contends, however, that it is also necessary for the jury to hear the rest of the "not unfairly prejudicial" testimony redacted by the trial court in order to present

---

[9] As the Commonwealth recognizes in its Submission of Synopsis of Evidence Pertaining to List of Sexually Abusive Priests Admitted During Previous Trial, the trial court's March 10, 2020 order also allows the Commonwealth to introduce Lynn's deposition testimony on June 19, 2014, at pages and lines 500(22) to 504(4). There, Lynn discussed the List, testifying that he had left his copy of the List at a meeting, discovered that copies of the List had been shredded at Cardinal Bevilaqua's behest, and that he had been unable to find his copy of the List when asked about it by the Grand Jury. ***See*** Commonwealth's Submission, 3/27/20, at 3. While Lynn specifically challenged the admission of this testimony at the exchange on March 16, 2020, it is clearly included in the testimony deemed admissible by the court in its March 10, 2020 order.

the jury with a fuller picture of Lynn's knowledge of the nature and scope of clergy sexual abuse, his intent to conceal abuse and his consciousness of guilt.

In explaining why it had excluded the trial and Grand Jury testimony that it did, the trial court stated that the probative value of the prior testimony it had excluded was outweighed by its potential to unfairly prejudice Lynn and that its admission would serve to undermine previous decisions by this Court. To that end, the court noted that it could not divorce this appeal from the case's history and the previous decision by this Court in **Lynn III** that Lynn was entitled to a new trial on the basis of the "oversaturation of prejudicial" other-acts evidence, "much of which had nothing to do with Lynn" or the charges he was facing. Trial Court Opinion, 8/21/20, at 15. The trial court explained that it had excluded the prior testimony because it touched either "directly or indirectly" on the matters **Lynn III** ruled inadmissible. **Id**. The court stated:

> Specifically, this Court has no problem with Lynn's prior testimony that he reviewed the Secret Archives prompted by the Dux matter, created a List, and at the time of his testimony he could not locate the List.[10] However, intertwined in that testimony was evidence regarding the contents of the List identifying 35 priests along with their classification into categories and collateral testimony about Lynn's and/or the Archdiocese's handling of those matters. This was troublesome.

---

[10] Indeed, the trial court clarified that the March 10, 2020 order still allowed the Commonwealth to "talk about your list. You can talk about [Lynn's] input in creating it. And, you can talk about those three -- three to four cases that the Court has allowed you to talk about." N.T., 3/16/20, at 37.

Lynn's prior testimony identified 35 priests with sexual allegations that he put on the List. The List included three pedophiles, [12] who were guilty or admitted guilt and 20 whose conduct was unsubstantiated. Most certainly the vast majority of these 35 priests created the source for the [21] incidences of prior bad acts evidence admitted at Lynn's first trial and the … nine cases the Commonwealth previously argued before this Court of which only three were deemed admissible. It is difficult to separate the testimony about the act of creating the List and Lynn's inability to find it from the evidence about impermissible testimony about priests other than Avery, Brennan, Bolesta and Cudemo, the number of cases involved, and acts of the Archdiocese not attributable to Lynn.

\*\*\*

The reach of the List testimony is much more expansive than the purported limited purpose of verifying Lynn's creation and inability to produce it. The testimony about the contents of the List repeatedly discloses the numerous priests involved, and in some cases reveals their names and ill deeds (these are priests other than Avery, Bolesta, Brennan and Cudemo). Also, the List testimony reaches into what the Archdiocese did or did not do, and so much more not having to do with Lynn's supervision of Avery.

\*\*\*

The Commonwealth's insistence on the admissibility of Lynn's prior testimony, as presently requested, is a backdoor attempt to override this Court's prior ruling reducing the copious 'other evidence' that permeated the initial trial. Lynn is slated for retrial on one count of EWOC for his supervision of Avery along with protecting the welfare of D.G. and the other children at St Jerome's School. As such, it would be improper to allow this retrial to proceed in a manner that has the potential to hold Lynn accountable for the behavior of others unrelated to the instant allegations.

*Id*. at 19-21.

The Commonwealth, in arguing this ruling was erroneous, spends a large portion of its brief insisting that the excluded evidence is relevant and

probative of Lynn's knowledge regarding his recommended placement of Avery and the danger the placement created for the children of St. Jerome's. This may be so, but as this Court noted in both **Lynn III** and **Lynn IV**, "merely crossing the threshold of demonstrating that other-acts evidence is probative of some Rule 404(b)(2) category does not, by itself, demonstrate admissibility. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." **See Lynn IV**, 192 A.3d at 170 (*quoting* **Lynn III**, 2015 WL 9320082, at * 14; citations omitted). Here, the trial court conducted the balancing test and determined, in its discretion, that the probative value of the evidence did not exceed its potential to unfairly prejudice Lynn.

The Commonwealth takes issue with the court's determination that the excluded evidence has the potential to be unfairly prejudicial to Lynn. According to the Commonwealth, this potential is abated by the fact that the evidence excluded by the trial court here does not contain the type of "excessive and graphic" details about the sexual abuse allegations lodged against a litany of other priests that was ruled inadmissible by **Lynn III**. This argument, in our view, misses the mark. Simply because the testimony ruled inadmissible here is not the exact same testimony ruled inadmissible by **Lynn III** does not mean that the trial court abused its discretion in finding that the testimony sought to be admitted at Lynn's retrial had the potential to unfairly

prejudice him and that, on balance, that potential for unfair prejudice outweighed any probative value of the testimony.

Indeed, the Commonwealth does not argue that the court abused its discretion in that its decision to exclude the evidence reflected manifest unreasonableness, partiality, prejudice, bias, ill-will or such a lack of support so as to be clearly erroneous. Instead, as Lynn points out, the Commonwealth merely disagrees with the conclusion the trial court arrived at following its application of the balancing test. The Commonwealth, in effect, is asking this Court to find an abuse of discretion on the part of the trial court on the basis that we believe the balancing test should have produced a different result. This, of course, we cannot do. **See Commonwealth v. Dillon,** 925 A.2d 131, 136 (Pa. 2007) (stating that "an abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous").

After reviewing both Lynn's previous testimony that the trial court deemed admissible as well as his testimony that the court deemed inadmissible, along with the trial court's reasoning for those evidentiary decisions, we cannot say that the trial court abused its discretion. The trial court was tasked with examining a massive amount of Lynn's prior testimony to determine its admissibility at Lynn's retrial. As discussed above, it deemed a significant portion of that testimony admissible. However, when the

testimony encroached too closely on allegations or dealings regarding priests other than Avery, Brennan, Cudemo and Bolesta, the trial court took its lead from *Lynn III*'s admonishment to contain the case to the charges at hand, and ruled that testimony, on balance, to be inadmissible.

It is important to emphasize that the order and evidence at issue are confined to the parts of Lynn's prior testimony that will be admissible at Lynn's retrial, and not to any other type of evidence. As the parties continued to make arguments on March 16, 2020, regarding what evidence and what documents should or should not be admissible at retrial, the trial court repeatedly reinforced to the parties that the court's March 10, 2020 ruling related solely to Lynn's prior testimony. *See* N.T., 3/16/20, at 31, 33, 35, and 36. The court reminded the parties one last time, stating in no uncertain terms that "[t]he one specific ruling last week [on March 10, 2020] was with regard to the admissibility of Monsignor Lynn's prior testimony in a number of different venues." *Id*. at 42.

That is the only ruling before us in this interlocutory appeal. The March 16, 2020 exchange and the parties' subsequent filings make it abundantly clear that the parties disagree on what documents should be admissible at Lynn's retrial and that they continue to disagree on a host of other evidentiary issues. However, the Commonwealth's interlocutory appeal, properly before us, involves only the court's March 10, 2020 order ruling on which portions of Lynn's prior testimony should be admissible at Lynn's retrial. Accordingly, we

conclude that the Commonwealth has not shown that the trial court abused its discretion in entering that order.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/2021

AUG 21 AM 9:52

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :    CP-51-CR-0003530-2011
                                :
                                :
                                :
                                :
              V.                :
                                :
                                :
                                :
                                : SUPERIOR COURT OF PENNSYLVANIA
                                :    1105 EDA 2020
                                :
        WILLIAM LYNN            :


                    O P I N I O N

BRIGHT, J.

Monsignor Lynn, the defendant in this case was convicted of Endangering the Welfare of

Children as a Course of Conduct on June 22, 2012 following a jury trial presided over by the Honorable

M. Theresa Sarmina. Issues relating to that conviction have been heard by both the Supreme Court of

Pennsylvania and the Superior Court of Pennsylvania which ultimately remanded the case to the Court of

Common Pleas, Philadelphia County for a new trial on December 22, 2015.

On remand, the Lynn case was assigned to this Court in August 2016, and a new trial was

scheduled for May/June 2017. Prior to the 2017 trial the Commonwealth (the Appellant in the instant

appeal) filed a Motion in Limine to Admit Evidence of Other Bad Acts Pursuant to Pa. R.E. 404(b)

seeking to introduce at trial evidence of acts of sexual abuse by other priests and the surrounding handling

of those matter by the Archdiocese of Philadelphia, many of which unrelated to the charge against the

defendant Lynn (hereinafter referred to as "Lynn"). Simultaneously, Lynn sought to have the prosecution

dismissed on a number of grounds, including double jeopardy because of prosecutorial misconduct. After

numerous hearings and careful review, this Court on April 19, 2017, denied Lynn's Motion to Dismiss

along with granting in part and denying in part the Commonwealth's 404(b) Motion. Both parties

appealed. On June 28, 2018 the Superior Court affirmed this Court's rulings. The Commonwealth's

1

Petition for Allowance of Appeal was denied by the Supreme Court of Pennsylvania on May 20, 2019. Upon return to this Court a trial date was scheduled for March 16, 2020. Commonwealth v. Lynn, 192 A.3d 165 (Pa. Super 2018), reargument denied, appeal denied, 212 A.3d 502 (Pa. 2019).

Since May 2019 the litigants have filed a barrage of Motions which have been heard by this Court. This Court entered Orders relating to those Motions on March 10, 2020 and March 11, 2020 and the Lynn trial was to begin with jury selection on March 16, 2020. It was during the week of March 9, 2020 that the seriousness of the coronavirus pandemic became increasingly apparent, and, on March 16, 2020 (the date that jury selection was to begin), notice was received that the Courts would be closed due to the public health crisis. A new trial date has been scheduled for January 4, 2021. The litigants responses was to file more motions and on May 4, 2020 the Commonwealth filed this Interlocutory Appeal.

## ISSUES

Appellant/Commonwealth's 1925(b) Statement of Errors Complained of on Appeal claims the following:

1. Did the lower court err by precluding the admission of Grand Jury testimony and trial testimony from defendant's first trial concerning defendant's supervision of Edward Avery, which is relevant to his guilt of endangering the welfare of a child?

2. Did the lower court err by precluding the admission of Grand Jury testimony and testimony from defendant's first trial concerning the list of sexually abusive priests defendant compiled, including its creation, contents, use, and concealment, which is relevant to his guilty of endangering the welfare of a child?

3. Did the lower court err by precluding the admission of Grand Jury testimony and testimony from defendant's first trial concerning defendant's role in the creation of the Archdiocese's sexual abuse policy, which is relevant to this guilty of endangering the welfare of a child?

2

4. Did the lower court err by precluding the admission of Grand Jury testimony and testimony from the defendant's first trial concerning defendant's knowledge of grooming techniques used by sexually abusive priests, which is relevant to his guilt of endangering the welfare of a child?

5. Did the lower court err by precluding the admission of Grand Jury testimony and testimony from defendant's first trial concerning defendant's moving sexually abusive priests to other dioceses, which is relevant to his guilt of endangering the welfare of a child?

In light of the voluminous documents reviewed by this Court, along with the fact that much of what the Commonwealth sought to have admitted at trial, was allowed, an Order for a more specific 1925(b) Statement specifying the specific redactions complained of was issued. The Appellant/Commonwealth responded with the following:

In response to the Commonwealth's February 12, 2020 Motion in Limine and Defendant's February 25, 2020 Motion in Limine, this Court held in its Order dated March 10, 2020, that all defendant's previous trial and Grand Jury testimony identified in those motions is admissible on retrial, with the exception of specifically-identified portions of defendant's May 23, 2012, May 24, 2012, May 29, 2012 trial testimony and his February 27, 2004 Grand Jury testimony. On July 8, 2020, this Court ordered the Commonwealth to provide the dates, pages, and line numbers of the specifically-identified Trial and Grand Jury testimony that it believes was erroneously precluded by the Court's Order. The Commonwealth identifies that testimony below. The precluded evidence concerns defendant's: 1) supervision of Edward Avery; 2) creation, contents, use, and concealment of a list of sexually abusive priests; 3) creation of the Archdiocese's sexual abuse policy; 4) knowledge of grooming techniques used by sexual abusers; and 5) practice of transferring sexually abusive priests from the parishes where they had committed abuse. The Commonwealth respectfully submits that the precluded evidence is relevant to establishing the elements of Endangering the Welfare of Children, 18 Pa.C.S. §4104, and that its potential for prejudice is significantly exceeded by its probative value:

3

<u>Defendant's May 23, 2012 Trial Testimony (references are to Notes of Testimony)</u>

1) Page 165, line 5 to page 171, line 8;

2) Page 181, line 9 to page 184, line 10;

3) Page 184, line 19 to page 185, line 16;

4) Page 219, line 9 to page 222, line 18;

5) Page 223, line 20 to page 226, line 20;

6) Page 226, line 21 to page 229, line 6

<u>Defendant's May 24, 2012 Trial Testimony (references are to Notes of Testimony)</u>

1) Page 38, line 1 to page 56, line 1;

2) Page 88, line 20 to page 89, line 6;

3) Page 90, line 10 to page 90, line 21;

4) Page 120, line 9 to page 127, line 6;

5) Page 137, lines 10 to 14

<u>Defendant's May 29, 2012 Trial Testimony (references are to Notes of Testimony)</u>

1) Page 83, line 19 to page 86, line 25;

2) Page 98, lines 17-23;

3) Page 128, line 3 to page 129, line 18

<u>Grand Jury Testimony 2/27/04 (references are to Notes of Testimony)</u>

1) Page 46, line 22 to page 47, line 12;

2) Page 48, line 25 to page 50, line 22;

3) Page 51, line 12 to page 52, line 1;

4) Page 52, line 22 to page 63, line 15;

5) Page 64, line 6 to page 68, line 13;

6) Page 69, line 15 to page 75, line 24;

7) Page 77, line 6 to page 83, line 6;

8) Page 85, line 1 to page 88, line 3;

4

9) Page 94, line 5 to page 96, line 18;

10) Page 122, lines 18-24

## FACTS

The Court incorporates herein its factual statement from the first remand Opinion dated August 4, 2017; and will supplement with what has transpired since the second May 2019 remand:

Defendant Lynn was convicted by a jury before the Honorable Teresa Sarmina of one count of Endangering the Welfare of a Child and was sentenced to a term of incarceration of three to six years. This Court respectfully incorporates herein the succinct statement of the facts as set forth by the Superior Court of Pennsylvania in its Memorandum Opinion, No. 2171 EDA 2012, 2015 WL 9320082 (Pa. Super., Dec. 22, 2015):

> "Appellant, Monsignor William J. Lynn, served as Secretary for Clergy ("Secretary") for the Archdiocese of Philadelphia ("Archdiocese") from June of 1992 until June of 2004. During that time, Appellant was responsible for, inter alia, handling clergy sexual abuse issues that arose with the Archdiocese. In that capacity, Appellant supervised a priest, Edward V. Avery ("Avery"), who molested a ten-year-old altar boy at St. Jerome's Parish in 1999. In his capacity as Secretary, Appellant placed Avery in a rectory at St. Jerome's following allegations of sexual abuse that came to light in 1992, regarding Avery's conduct at another parish between 1978 and 1981. The jury in this case ultimately convicted Appellant of EWOC for his deficient supervision of Avery. A full summary of the facts relating to Appellant's supervision of Avery can be found in our December 26, 2013 Opinion. See Lynn, 83 A.3d at 437-45. Additionally, or Supreme Court also provided its own summary of this evidence and related matters in its April 27, 2015 decision. See Lynn, 114 A.3d at 798-808."

On December 22, 2015 the Superior Court vacated Lynn's conviction and remanded for a new trial after finding "that the trial court abused its discretion by admitting a high volume of unfairly prejudicial other crimes evidence." Id.

During Lynn's original trial the Commonwealth was permitted to introduce nearly two dozen examples of sexual abuse by priests, not Lynn, some of which dated back decades, and the Archdiocese's

5

handling of those matters. The Superior Court balanced the "totality of the evidence" as to its probative value and potential to unfairly prejudice defendant. On totality it was found to be excessive.

As the Commonwealth Motion progressed before this Court the requested inclusion of "other crimes evidences" went from the original twenty one (21) to twelve (12), and, ultimately to nine (9). N.T. 3/28/17 at 9, 11. After careful review and guidance from the Superior Court Opinion in Commonwealth v. Lynn, Id. three (3) of the Commonwealth's proposed "other crimes evidence" was permitted relating to Father Robert Brennan, Father Michael Bolesta and Father Nicholas Cudemo. N.T. 3/28/17 at 18-20; N.T. 4/19/17 at 4-5. On Appeal the Superior Court rejected the Commonwealth's claim that all nine (9) instances of other crimes evidence was necessary; ruling that the evidentiary rulings were within the trial court's discretionary powers.

Subsequent to the 2019 Appellate Court remand, through the litigants' respective Motions in Limine, this Court was called upon to address the admissibility of Lynn's prior testimony at trial, the Grand Jury, civil depositions and sentencing. By Order dated March 10, 2020 this Court allowed much of Lynn's prior testimony subject to redaction of specific testimony that was inconsistent with this Court's prior rulings (which were affirmed) limiting prior bad acts evidence to that relating to Fathers Brennan, Bolesta and Cudemo.

## DISCUSSION

The Appellant/Commonwealth complains that this Court's rulings precluding sections of Lynn's prior testimony hampers its ability to prove its case against Lynn, charged with one count of Endangering the Welfare of Children, 18 Pa. C.S. §4304. This is a meritless claim. Moreover, this Court views the Appellant/Commonwealth's attempt to introduce this evidence as a not so veiled effort to circumvent the Pennsylvania Supreme and Superior Court's rulings and this Court's previously affirmed orders limiting the admissibility of other crimes evidence in this matter. Commonwealth v. Lynn, 83 A.3d 434 (Pa. Super. 2013), reversed and remanded 114 A.3d 796 (Pa. 2015); Commonwealth v. Lynn, 192 A.3d 165 (Pa. Super 2018), reargument denied, appeal denied, 212 A.3d 502 (Pa. 2019). Question is also raised as to whether the Commonwealth is abusing its right to file an Interlocutory Appeal, and is taking undue

6

advantage of the COVID-19 crisis to further delay prosecution of this case which has been awaiting retrial since initial remand December, 2015.

Provision for Interlocutory Appeal as of Right is set forth at Pa. R.A.P. 311 (a)(8)(d) which states in pertinent part:

(d) Commonwealth appeals in criminal cases. – In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

For all intent and purpose, but for the COVID-19 Court Closure this case was going to trial on Monday, March 16, 2020. Moreover, Court Administration was giving priority standing to the Lynn case regarding availability of the limited jury pool. The objectionable evidentiary Orders were made March 10, 2020 and March 11, 2020. If the Commonwealth truly believed its prosecution was irreparably handicapped and with the jury selection fast approaching would it not have been imperative for the Commonwealth to file this Appeal within the few days available prior to March 16, 2020. This is one scenario that these unusual COVID-19 circumstances present. The other pertains to the fact that while the rulings were made, and reconsideration denied this Court remained open to reviewing, once again, the redacted portions of Lynn's prior testimony and requested additional clarification regarding the evidence's relevance. Reflective of this is the Commonwealth's submission of additional memorandum summarizing its relevancy argument. Given the March 16, 2020 COVID-19 Court Closure, a new trial date of January 4, 2021, the filing of both sides additional Motions, the Commonwealth's subsequent to March 16, 2020 Synopsis of Evidence it came as a surprise to this Court the May 4, 2020 filing for Interlocutory relief. There is concern as to whether the trial scheduled for January 4, 2021 will be able to go forward. Motions, including any issues or recommendation regarding the instant issues, scheduled for September 14, 2020 cannot be heard and are held in abeyance. Under the circumstances Interlocutory relief should be denied given the posture of this case.

7

Moreover, Interlocutory relief should be denied on the merits. The Appellant/Commonwealth's claim that this Court's evidentiary ruling hinder its ability to prove Endangering the Welfare of a Child (hereinafter referred to as EWOC) is without merit. Specifically, Appellant/Commonwealth's assertion that this Court erred by precluding Lynn's prior testimony concerning Lynn's: supervision of Edward Avery; role in the creation of the Archdiocese's sexual abuse policy; knowledge of grooming techniques used by sexually abusive priests; and, the movement of sexually abusive priests to other dioceses is simply false. A review of the permissible testimony demonstrates the inaccuracy of these claims.

## LYNN GRAND JURY TESTIMONY RULED ADMISSIBLE

Appellant/Commonwealth's requested Lynn Grand Jury testimony was identified for this Court by date, page and line. The testimony requested from the Grand Jury proceedings from June 7, 2002 and June 13, 2002 was granted in its entirety. This Court ordered redactions to specific sections of the February 27, 2004 testimony which was otherwise found to be admissible.

The permissible testimony from June 7, 2002[1] included evidence which can be summarized as follows: Lynn's current, as of 6/7/02, tenure with the Archdiocese of Philadelphia as Secretary of Clergy whose duties included investigating allegations of sexual abuse involving priests; current, as of 6/7/02, Archdiocese policy which Lynn helped to codify in writing in 1993 regarding Archdiocese investigation of sexual abuse complaints; step by step details about how Lynn handled the investigation of a sexual abuse allegation; what occurred when a priest admitted the abuse, including treatment referrals and a discussion about laicization (defrocking); what was told to the complainants about investigations; details about the location of, and who had access to the Secret Archives where documents pertaining to sexual assault allegations were maintained; who in the Archdiocese hierarchy were informed about complaints; and who was involved in the discussion about what would be disclosed to a parish or school about the investigation.[2] All of this prior Lynn testimony was ordered admissible.

---

[1] 6/7/02 (by page (P) and line (L)): P3 L19 to P7 L18; P24 L11 to P44 L17; P46 L1 to P53 L4; and P70 L4 to P74 L17.

[2] 6/7/02 (by page (P) and line (L)): P3 L19 to P7 L18; P24 L11 to P44 L17; P46 L1 to P53 L4; and P70 L4 to P74 L17.

The Commonwealth's requested Lynn Grand Jury testimony from June 13, 2002 was ordered admissible in its entirety. In summary that testimony focused on: the location of and placing in order by Lynn sexual abuse files for Archdiocese attorneys in preparation for discussions with the Philadelphia District Attorney; further discussion about the Archdiocese policy codified in 1993, specifically regarding reporting sexual abuse allegations to the police; Lynn's knowledge of Pennsylvania law which in 1995 made clergy mandatory reporters where minors were involved and how that requirement was conveyed to members of the Archdiocese; any training regarding the mandatory reporting requirements; Lynn's role in training new priests about the mandatory requirement and his role in investigating claims of sexual abuse. There was also significant testimony about Archdiocese policy for repeat offenders. On this issue Lynn testified "Since I've been in here, I'm not aware of anybody that has repeated – we hadn't put them back in ministry except for those limited groups" ... "People who had offended, had undergone treatment and were-not found to be pedophiles, were not diagnosed as pedophiles, but had engaged in an act of pedophilia ..." [3]

Lynn's February 27, 2004 Grand Jury testimony focused on the same themes probed in 2002, but with more specificity; much of which was ordered admissible for the pending retrial. The permissible evidence elicited from that testimony included: there was no formal training for, and none was offered by the Archdiocese save for a few workshops to prepare Lynn for his duties to investigate priest sexual abuses matters; Lynn characterized his training as "on the job" initiated when he assisted Monsignor Malloy as a note-taker interviewing those involved in sexual abuse complaints; when Lynn became aware of the Secret Archives, and how he did not go through those files until two years into his role as Secretary of Clergy, and did so "to see – to make sure I knew or had an idea – make sure we didn't have anybody in ministry that shouldn't be in ministry"; as part of the sexual abuse complaint process Lynn checked the Secret Archives files to see if the priest in question had a file there; Lynn's duties as Secretary of Clergy also included the assignment of priests, a process which included discussion with a limited group in the

---

[3] C-261 (6/13/02) at 52, 24-25 and 53, 5-8. See also, all of which was admitted, 10, 14 to 22, 22; 26, 3 to 29, 19; 31, 10 to 33, 10; and 52, 13 to 53, 16.

Church hierarchy at priest personnel meetings where great deference was given to Lynn's recommendations; in making priest assignment recommendations Lynn presumed a priest did not have allegations of sex abuse in their past because otherwise they would not be in ministry, and described the minimal criteria for making that presumption; Secret Archive files of priests up for reassignment were rarely discussed at personnel board meetings because "they all had a right to their reputation"; and, references to the sex abuse review of Fathers Cudemo and Brennan. Interspersed throughout, Lynn was questioned about how the Archdiocese handled/and policy before and after Lynn's assignment as Secretary of Clergy. Also, Lynn testified about his interpretations of Cardinal Bevilacqua's views about clergy sex abuse.

In summary, the permissible Lynn Grand Jury testimony was lengthy, detailed and addressed specifically Lynn's role in creating the written Archdiocese sexual abuse policy, knowledge of grooming techniques, and movement of sexually abusive priests. None of the requested prior Grand Jury testimony touched on Lynn's supervision of Edward Avery, but the peripheral issues of Lynn's training, knowledge of, duties and how he fulfilled them relating to priest sexual abuse, along with Archdiocese tradition and policy handling such matters. The permissible trial testimony did directly reference Avery.

## LYNN'S PRIOR TRIAL TESTIMONY RULED ADMISSIBLE

This Court permitted the following prior trial testimony of Lynn as proposed by the Commonwealth. Reference is made to the Commonwealth's Exhibit A specifying the sections of the testimony along with a summary of the evidence. The sections are referred to by page, followed by line number.

**Trial 5/23/12**

83, 3 to 83, 24: Claimed he was not able to remove Avery due to lack of admission.

88, 12 to 88, 23: Asserted that St. John Vianney recommended ministry "not directly in charge of children".

92, 6 to 92, 17: Claimed that Avery had to be assigned, since there was no pedophile or ephebophile diagnosis.

10

189, 13 to 192, 3: Claimed that protecting children from sexual abuse was most important aspect of his job; disagreed that he never looked for other victims or made announcements regarding sexually abusive priest to parishes or media.

193, 12 to 206, 13: Discussed, with shifting answer, his power and capacity regarding assignment of priests and provision of information to St. John Vianney; assertion that he could only remove Avery if he admitted; was on Board of St. John Vianney; claim that Avery, who was guilty of sexual misconduct with a minor, did not have a sexual disorder.

217, 12 to 220, 18: Treatment of Avery had no effect on him in terms of abusing D.G.; Avery not diagnosed as pedophile by St. John Vianney, the Archdiocese hospital; had seen cases where someone who is not diagnosed as pedophile thereafter engages in acts of pedophilia; admits to being funnel of information to St. John Vianney and being the only person gathering information.

**Trial 5/24/12**

64, 18 to 83, 24: Admission that he did not give all the facts to Officer Holmes during her interview of him regarding Cudemo; confrontation regarding inconsistencies between interview and documents in his file, including those concerning Cudemo being retired and never being reinstated, restrictions on Cudemo's facilities, Cudemo victimizing 8 additional minors, Cudemo making admissions and Cudemo's diagnosis as a pedophile; inconsistency between his and Officer Holmes testimony as to veracity of victim, admission that in his 12 years as Secretary for Clergy he never called police.

84,1 to 85, 1: Confronted with conflict between his testimony and that of Sister Cathleen Schipani regarding existence of other victims.

135, 16 to 137, 23 (EXCEPT FOR 137, 10-14): Admitted knowing in 1995 that "diagnosed" pedophiles do not get cured and victimize over and over again; claimed he was only able to take action if there was a diagnosis of pedophilia or ephebophilia.

11

149, 15 to 157, 7: Bolesta case was his first experience in sexual assault case; was exposed to effect of abuse on victim and mother; acknowledged that eighth grade boys were concerned about warning people at Bolesta's next assignment.

161, 3 to 162, 3: Admitted that limited ministry does not eliminate contact with children, and limits but does not eliminate potential victims; admitted that announcements to parishes, and media announcements would have been helpful in reducing victimization.

210, 24 to 216, 19: Acknowledged that Cudemo, a diagnosed pedophile, disobeyed orders regarding treatment, yet 3 years later, "health problem" was the reason professed for initiating Cardinal removal process.

**Trial 5/29/12**

45, 12 to 50, 10: After reviewing complaint from 5 boys in Robert Brennan file, admitted that Brennan was told to keep a "low profile" due to concern for Brennan; then claimed that the concern was for the victims, despite that assertion never appearing in the file.

52, 12 to 60, 10: Admitted that as Secretary for Clergy, he was the eyes and ears of the Cardinal in matters of sexual abuse of minors by priests; in discussing Brennan assignment, claimed that he relied upon advice of "professionals" that Brennan rubbing upper thigh of an altar boy was a boundary violation rather than sexual abuse; claimed that he told pastor at Brennan's new parish about strict restrictions on Brennan despite memo in Brennan's file to the contrary.

75, 23 to 77, 6: Blamed Cardinal for keeping diagnosed pedophile Cudemo in ministry and removing restrictions; saw a moral problem in that, but claimed he was "working with the limited authority" he had.

87, 17 to 88, 16: His decision, as reflected on the List, that evidence against Bolesta was inconclusive despite multiple victim complaints, including the grabbing of a boy's testicles, was based upon therapist's determination that such conduct only constituted "boundary violations"

96, 16 to 102, 24 (EXCEPT 98, 17-23): Confrontation with and denial of file contents and testimony regarding Avery, including Fisher's assertion that sexual assault claim was associated

12

with disc jockeying, lying to Fisher regarding Avery's denial, focus in letter to Avery's sister on protecting Avery and other priests, lying to parishioners regarding reason for Avery removal, and incomplete information provided to St. John Vianney.

102, 25 to 107, 5: Admission that he never looked for other Avery victims despite therapist's concern that other victims may exist and understanding that diagnosis was based upon there being only one report of abuse which occurred while Avery was drinking.

107, 6 to 112, 2: Discussed Our Lady of Ransome and St. Jerome Parish recommendations for Avery; admitted to recommendation for associate pastor position at Our Lady of Ransome Parish with a grade school despite therapist recommendation for a ministry "excluding adolescents" and his own understanding that there can be no ministry which is absolutely successful in excluding adolescents; denied that offering assistance at St. Jerome parish involved interactions with altar boys.

120, 10 to 129, 18 (EXCEPT 128, 3 to 129, 18): Claimed that Avery is "very very rarely" assisting in St. Jerome; acknowledged that he compiled the List shortly after Avery assignment to St. Jerome; claimed that Avery disc jockeying was "one-time thing and it stopped," then admitted there were additional complaints about it and he kept Avery there despite prior sexual assault of minor associated with disc jockeying, claiming that he was required to make recommendations for assignments based upon the information he had.

129, 20 to 132, 4: When confronted about the policies he followed resulting in kids being abused, admitted that he only knew of one – D.G. – that was abused during the time he handled a priest; admitted to instructing Avery to "play things low-key" and only taking further action regarding Avery when the review board was established 8 years later, which he agreed was too late for D.G.; said he was sorry about that, and was sorry when he first heard about D.G.

132, 6 to 132, 12: Admitted to keeping Avery in ministry despite defendant's observation, in a 4/2/98 memo, that Avery seemed to be minimizing his experience at St. John Vianney and the allegations against him; defendant claimed he wasn't permitted to take him out of ministry.

132, 17 to 134, 11: Contradictory claims regarding Avery's disc jockeying activities; in discussing letter from victim Fisher's brother in which he states that defendant has a problem if Avery is anywhere near children, defendant claimed that he did not keep Avery near children, since "his assignment was the hospital"; then admitted that Avery "was still at the parish".

A review of the admissible prior testimony, as set forth above, should make it apparent that Appellant Commonwealth's claim of error in its 1925(b) Statement, paragraph (1), (3), (4) and (5) are simply false and unsupported accusations. A gleaning of that testimony establishes that this Court allowed all, and which is a significant amount, prior Lynn testimony concerning: his supervision of Avery; his role in the creation of Archdiocese sexual abuse policy; his knowledge of grooming techniques used by sexually abusive priests; and his role in the assignment of priests; and any assignment/movement of priests with sexual abuse allegations as it relates to Avery, Brennan, Bolesta and Cudemo.

Several of Appellant/Commonwealth's complaints are frivolous and/or at best harmless. For example, the Commonwealth submitted for this Court's review on the Motion in Limine, C-273 Grand Jury Notes of Testimony 2/27/2004, page 10 line 15 to page 88 line 3. Out of the several pages of testimony this Court ordered redaction of page 46, line 22 to page 47, line 12 because the defense had concerns regarding possible prejudicial impact of Lynn's request to consult with his attorney during the cross examination. The redacted section is as follows:

> QUESTION: Did you ever do any – did you ever do any research or read any studied with regard to the frequency in which a sexual abuser would admit to actually committing the abuse?
> ANSWER: Can I talk to my lawyer for a minute?
> QUESTION: Sure, absolutely.
> (Whereupon a discussion was held off the record by and between the witness and his counsel.)
> By Ms. McCartney:
> QUESTION: Have you had the chance to consult with your attorney?
> ANSWER: Sure.
> QUESTION: Did you want to say something?
> ANSWER: No, no.

14

The next question, and line of examination, which this Court did not redact was:

QUESTION: Okay. All right. Do you recall, Monsignor, doing any research or reading any studies with regard to the frequency with which a perpetrator of sexual abuse of minors would admit their misdeeds?
ANSWER: No, I didn't.
C-273 (2/27/04) page 47, line 13 to line 17. See also, C-273 (2/27/04) page 47, line 18 to page 48, line 12.

There was a similar scenario with the redaction at C-273 (2/27/04) page 51, line 12 to page 52, line 10, although in addition to the consulting with an attorney reference, there was discussion about another, unrelated sexual assault allegation, the Dux case. After the redacted sections, Lynn's testimony continued regarding his handling of sexual abuse allegations from 1991 to 1994. Id. at page 52, line 11 to line 21. A similar example can be found at page 122, line 18 to line 21; and the question restated followed by an answer was permitted at line 25, page 123 line 1 to line 6. There has been no harm to Appellant/Commonwealth's prosecution of this case, specifically regarding these sections., specifically regarding these sections.

It is important in the analysis of Appellant/Commonwealth's grievances to consider the history of this case along with the unique evidentiary context which derailed the first Lynn trial because of the trial Court's allowance of the Commonwealth's oversaturation of prejudicial "other crimes evidence", much of which had nothing to do with Lynn. Additionally, the instant matter should be viewed in the context of what this Court allowed of the prior testimony balanced against the limited redactions because the precluded prior testimony referenced directly or indirectly matters that had previously been ruled inadmissible, and affirmed by the Superior Court.

The crux of Appellant/Commonwealth's complaint centers around redaction of Lynn's perusal, starting roughly two years into his Secretary of Clergy position, of the three hundred and twenty two (322) Secret Archives files, identifying thirty-five (35) of which related to priests with sexual allegations. Lynn's review was prompted by allegations against an active clergyman, Reverend James Dux, and

15

resulted in Lynn's creation of a list, which at the time of Lynn's testimony, he proffered it could not be located. Within the List, Lynn classified the thirty-five (35) priests into three categories: (A) group for priests found to be pedophiles of which there were three; (B) group consisting of twelve priests found to be guilty or who admitted guilt; and the (C) group of twenty priests whose sexual misconduct allegations were unsubstantiated.

The redacted sections of the trial testimony were summarized by Appellant/Commonwealth as follows:

**Trial 5/23/12**

165, 5 to 171, 8: Discussed appearance before Grand Jury, production of secret archives files, including that of Dux, which included memo which references List (of priests accused of sexual abuse of minors contained in secret archives files) which defendant told the grand jury he couldn't find; subsequently looked for and was unable to find List.

181, 9 to 184, 10: Claimed that he never put concerns of priests ahead of those victims and did the best he could within parameters he was given; despite that, things did not turn out well for D.G.

184, 19 to 185, 16: Claimed was following instructions of Cardinal regarding announcements about priests.

219, 21 to 223, 9: Shifting responses as to role in producing List; admission that he can't remember but must have typed it.

223, 20 to 226, 20: Conflicting responses as to whether he told victims they could go to civil authorities; admits to giving different answer to grand jury; can't recall an instance of informing a victim of right of reporting to civil authorities.

226, 21 to 229, 16: Conflicting testimony regarding length of time consumed in creation of clergy sexual abuse policy in grand jury (one week) and trial (years long).

16

**Trial 5/24/12**

38, 1 to 56, 1: Conflicting grand jury and trial testimony regarding creation of List, reasons therefor, and meeting with Cardinal regarding List; no recollection of any memos regarding taking any actions as to priests on the List.

88, 20 to 89, 6: During his review of secret archive files which led to production of List, saw pattern of priests being transferred to other parishes.

90, 10 to 90, 21: Admitted that to avoid scandal would put abusive priest somewhere where he would not encounter victims, but disagreed that there was a pattern of this.

120, 9 to 127, 6: Claimed that he was trying to effectuate change based upon analysis of secret archive files despite not having access to List, which he claims he could not find after looking for it on his computer, after the grand jury asked for it; denied he hid the List.

135, 16 to 137, 23:

[HERE THE ONLY DISPUTED REDACTION WAS AT PAGE 137, LINES 10 TO 14]

Q: You let- there's three people on that List diagnosed pedophiles, there's 13 people guilty of sexual misconduct with minors. How many of them did leave in ministry.

**Trial 5/29/12**

83, 19 to 86, 25: In discussing priests on List, initially claimed that he couldn't take the action he wanted to regarding their removal, then, when confronted with the fact that he could have made recommendations in that regard, claimed that he didn't make the recommendations because they would be ignored; asserted that he wasn't "content" leaving guilty pedophile priests in ministry due to the advice of "professionals"; stayed in position for 12 years because he thought he was doing the right thing.

96, 16 to 102, 24:

[HERE THE ONLY DISPUTED REDACTION IS AT PAGE 98, LINES 17-23]

Q: In "92", you also heard about that kind of stuff, at least through some of the cases, correct?

A: Just in the beginning, yes.

17

Q: Because it just seems to be a pattern with this wrestling and these altar boys, correct, even in '92'?

A: Well, not with every one of them, no.

120, 10 to 129, 18:

[HERE THE ONLY DISPUTED REDACTION IS AT PAGE 128, LINE 3, TO PAGE 129, LINE 18]

Q: C-75, a little further on down.

A: I was not the Cardinal Archbishop of Philadelphia. I had to make recommendations for these priests to make assignments. I didn't like making those recommendations.

Q: But you did it anyway, didn't you?

THE COURT: What did you have to choose from in terms of the recommendations that were made.

DEFENDANT LYNN: Uh, well, it would depend on the priest.

THE COURT: If you would tell the jury.

DEFENDANT LYNN: It would depend on the priest and what the problems were and what the problems surrounding the priest were, you know, about what kind of recommendations would be made. Some would be chaplaincies. A good number of them were trying to find unlimited type of ministry, which in the end, was almost impossible anyway. But to have a limited type where there would not be exposure to children or at least not regular contact with children where they could do the grooming.

THE COURT: None of these matters having to do with sexual abuse of minors went to a priest personnel board meeting, did they?

DEFENDANT LYNN: The sexual abuse of minors?

THE COURT: Yes.

DEFENDANT LYNN: No, Your Honor.

THE COURT: That was because they were secret?

18

DEFENDANT LYNN: The Cardinal would consider them confidential.

THE COURT: And so was it your understanding that because of that and that you had the Secret Archives at your -- that you had the access to those, that where a priest got assigned would depend on the information that you had about that priest?

DEFENDANT LYNN: That's right.

Prior Grand Jury testimony similar to the above precluded trial testimony was also redacted. The concern was the prior testimony regarding the contents of the List had the potential to unfairly prejudice the defendant and admissibility would undercut previous rulings of the Court.

Specifically, this Court has no problem with Lynn's prior testimony that he reviewed the Secret Archives prompted by the Dux matter, created a List, and at the time of his testimony he could not locate the List. However, intertwined in that testimony was evidence regarding the contents of the List identifying thirty-five (35) priests along with their classification into categories and collateral testimony about Lynn's and/or the Archdiocese's handling of those matters. This was troublesome.

Lynn's prior testimony identified thirty-five (35) priests with sexual allegations that he put on the List. The List included three (3) pedophiles, twelve (12) who were guilty or admitted guilt and twenty (20) whose conduct was unsubstantiated. Most certainly the vast majority of these thirty-five (35) priests created the source for the twenty-one incidences of prior bad acts evidence admitted at Lynn's first trial; and, the twelve to nine cases the Commonwealth previously argued before this Court of which only three were deemed admissible. It is difficult to separate the testimony about the act of creating the List and Lynn's inability to find it from the evidence about impermissible testimony about priests other than Avery, Brennan, Bolesta and Cudemo, the number of cases involved, and acts of the Archdiocese not attributable to Lynn.

In its 1925(b) Statement of Errors the Commonwealth asserts that the omitted Lynn prior testimony is relevant to establish his guilt of EWOC. As previously discussed, a review of the permissible prior testimony belies that assertion pertaining to Lynn's supervision of Avery, role in creation of Archdiocese policy, knowledge of grooming techniques and the assignment of priest sex offenders; as

19

that prior testimony was permitted. Thus, the only remaining issue pertains to the relevancy of the List to EWOC.

Subsequent to this Court's rulings, on March 12, 2020, the Commonwealth submitted <u>Proffer of Relevance of Evidence</u>, and after the COVID-19 Court Closure <u>Synopsis of Evidence Pertaining to List of Sexually Abusive Priests Admitted During Previous Trial</u>[4] all of which centers about the List. Here, Commonwealth links relevancy to: knowingly endangering children/refutes lack of knowledge in accident; and, consciousness of guilt by Lynn testifying he could not locate the List. Once again, it is this Court's view that the testimony about the List goes far beyond its creation by Lynn and his inability to produce it at the time of his testimony.

The reach of the List testimony is much more expansive than the purported limited purpose of verifying Lynn's creation and inability to produce it. The testimony about the contents of the List repeatedly discloses the numerous priests involved, and in some cases reveals their names and ill deeds (these are priests other than Avery, Bolesta, Brennan and Cudemo). Also, the List testimony reaches into what the Archdiocese did or did not do, and so much more not having to do with Lynn's supervision of Avery. Finally, the List testimony is overwhelmingly repetitive, covering the same areas over and over again.

18 Pa. C.S.A. §4304(a) Endangering Welfare of Children provides:

(a) Offense defined –

    (1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

---

[4] The Court has not had an opportunity to hear from the Defense regarding the Proffer and Synopsis because of the COVID-19 Closure and/or hold a hearing in that regard. This is another indication of whether or not Commonwealth's Interlocutory Appeal is appropriate.

(2) A person commits an offense if the person, in an official capacity, prevents or interferes with the making of a report of suspected child abuse under 23 Pa. C.S. Ch. 63 (relating to child protective services).

(3) As used in this subsection, the term "person supervising the welfare of a child" means a person other than a parent or guardian that provides care, education, training or control of a child.

This Court respectfully asks the Superior Court to consider its factual recitation and that of the Pennsylvania Supreme Court in Lynn's direct appeal. Commonwealth v. Lynn, 83 A.3d 434 (Pa. Super. 2013); Commonwealth v. Lynn, 114 A.3d 796 (Pa. 2015). Both Courts meticulously detailed the Commonwealth's trial evidence. Against that backdrop, and Lynn's prior testimony put aside, Lynn's List testimony, as presently requested, is not essential to the Commonwealth's ability to craft its prosecution in the retrial. Any probative value of that prior testimony is outweighed by the prejudice to Lynn in light of this Court's prior evidentiary rulings, affirmed on appeal.

The Commonwealth's insistence on the admissibility of Lynn's prior List testimony, as presently requested, is a backdoor attempt to override this Court's prior ruling reducing the copious "other evidence" that permeated the initial trial. Lynn is slated for retrial on one count of EWOC for his supervision of Avery along with protecting the welfare of D.G. and the other children at St. Jerome's School. As such, it would be improper to allow this retrial to proceed in a manner that has the potential to hold Lynn accountable for the behavior of others unrelated to the instant allegations.

21

## CONCLUSION

For the foregoing reasons, error was not committed and Interlocutory relief should be denied.

BY THE COURT

Bright 8/21/2020

BRIGHT, J.

22